(138 P.3d 388)
No. 95,051

JO ANN SEITZ and THE ESTATE OF OSCAR I. BECK, *Appellants*, v. THE LAWRENCE BANK, *Appellee.*

Opinion filed July 21, 2006.

*James L. Wisler*, of Wisler Law Offices, of Lawrence, for appellants.

*Steven F. Coronado* and *Richard D. Fry*, of Sherman Taff Bangert Thomas & Coronado, P.C., of Kansas City, Missouri, for appellee.

Before MALONE, P.J., GREEN, J., and BUKATY, S.J.

GREEN, J.: Jo Ann Seitz and The Estate of Oscar Beck (collectively Seitz) appeal from the trial court's grant of summary judgment in favor of The Lawrence Bank (Bank). The sole issue on appeal is whether the trial court erred in finding that Beck was a trespasser instead of a licensee or invitee on the Bank's property. Because Seitz has failed to bring forth evidence establishing a genuine dispute as to Beck's status on the property as an invitee or licensee, we determine that the trial court properly granted summary judgment. Accordingly, we affirm.

On the morning of December 4, 2003, Oscar Beck, an 81-year old man, was found lying in the drive-through area of the Bank located at 3500 Clinton Parkway in Lawrence. The Bank is at the intersection of Clinton Parkway and Kasold Drive, one of the busiest intersections in Lawrence. The Bank's property is adjacent to a shopping center in which a Hy-Vee grocery store is located. On December 4, 2003, the sidewalk on the south side of the Bank along Clinton Parkway was under construction and partially closed.

The Bank's surveillance videotape from December 4, 2003, shows a person walking up to and standing near the top of a retaining wall on the Bank's property. The next image on the videotape shows a person lying in the drive-through area of the Bank. When Beck was found, he was lying approximately 5 to 6 feet from the retaining wall on the east side of the Bank. The retaining wall next to where Beck was lying was approximately 30 to 38 inches in

height. The retaining wall separated the Bank's drive-through area from a grassy area on the east side of the Bank. The grassy area sloped down from a public sidewalk, which was at least 30 feet from the retaining wall.

It is unknown why Beck was on the Bank's property. Beck had no connection or accounts with the Bank. The Bank has an ATM machine located at the east end of the drive-thru lanes which is open 24 hours a day, 7 days a week for the use of individuals who are customers of the Bank as well as who are not customers of the Bank. Nevertheless, Beck's daughter Jo Ann Seitz, with whom Beck was living at the time, indicated that Beck had never visited the Bank.

Jo Ann testified that she really did not know why Beck left the house. Jo Ann speculated that Beck was on his way to Hy-Vee to purchase cigarettes. Jo Ann indicated that although Beck had smoked for years, he had quit smoking after suffering a fall in which he fractured his hip and pelvic bone in July 2003. After his fall, nurses would come into Jo Ann's home two to three times a week to help Beck with his personal hygiene. Jo Ann indicated that the nurses were still coming into her home in December 2003.

Jo Ann indicated that Beck had never before walked to Hy-Vee. Although Beck frequently took walks with his dog, he only walked approximately ½ to 1 block within the neighborhood. Jo Ann lived approximately ½ mile from where the Bank was located. When questioned about why she speculated that Beck was on his way to Hy-Vee when he had never before left her house to go to Hy-Vee on his own, Jo Ann stated: "Well, he had been to Hy-Vee before but not by himself. I mean he had gone with me. But I just think that he was going for cigarettes. That was just what I speculated. Because he was feeling good and he had not smoked in a long time."

When Beck was discovered by the Bank's employees, Beck was wearing pants and a shirt, a light windbreaker, and house slippers with no socks. The average temperature that day was in the mid-30's, and the Bank's employees covered Beck with blankets once he was discovered and an ambulance was called to the scene. Jo Ann indicated that sometime before his earlier fall in July 2003, a

health care provider had informed her that Beck had suffered a mini-stroke, which was common in older people. Nevertheless, Jo Ann indicated that Beck had a good memory and that he was not having any trouble recognizing people or places.

After Beck was discovered lying in the drive-through area of the Bank, he was taken to Lawrence Memorial Hospital and then transferred to the University of Kansas Medical Center. He was admitted for head and left hip injuries secondary to a fall. After approximately 1 month in the hospital, he was transferred to a nursing home. Beck died several days later at the nursing home from acute lobar pneumonia. Other factors contributing to his death included atherosclerotic disease and his previous head and hip injuries. Beck never told his daughter or his grandchildren how he was injured on December 4, 2003. Beck's daughter indicated that although Beck could communicate with her, he was in a lot of pain, and she did not want to press him for information about the incident.

When the incident occurred, there was no path or other indication that individuals were using the Bank's lawn as a shortcut. In her deposition on March 18, 2005, the Bank's teller, Darlene Mountain, testified that she was the only daytime teller at the Bank in the 4 years that she had worked there. Mountain indicated that the evening teller came in at 3 p.m. Mountain indicated that she had seen people cutting through the grassy area east of the Bank above the driveway three times in the 4 years that she had worked there. Mountain testified that some of these incidents occurred before December 4, 2003. Mountain reported one of the incidents to Vickie Knight, the Bank's executive vice president. According to Mountain, Knight told her that "[w]e need to try to let them know if we catch them not to do that." Mountain could not remember whether this conversation with Knight occurred before or after December 4, 2003. One of the times that Mountain saw an individual cutting across the grass, she turned on her speaker and told that person not to cut across the grass.

In her deposition, Knight acknowledged that some people walk across the Bank property to get to other buildings in the Hy-Vee shopping center or to the sidewalks. Knight further acknowledged that people can and have walked from Hy-Vee across the Hy-Vee

parking lot and south across the Bank's parking lot and then climbed the grassy slope south of the Bank to get to the sidewalk adjacent to Clinton Parkway.

The Bank's president, Terry Joe Sutcliffe, was unaware of any signs posted outside of the Bank that warned against trespassing. Furthermore, Knight indicated that there was nothing on the Bank's property on December 4, 2003, which would advise Beck not to walk in the grassy area east of the Bank. There were no signs posted along the sidewalk to warn people that there was a retaining wall on the west side of the grassy slope on the Bank's property. There was no guardrail along the retaining wall.

In August 2004, Seitz sued the Bank on theories of negligence, negligence per se, nuisance, and strict liability. The Bank moved for summary judgment on all of Seitz' theories. In responding to the Bank's summary judgment motion, Seitz stated that summary judgment had been granted on the theories of nuisance based upon the agreement of the parties. In addition, Seitz had withdrawn the negligence per se theory. Moreover, Seitz stated that the parties had agreed that further discovery was necessary on all other issues except Beck's status on the Bank's property. At a hearing conducted on the Bank's summary judgment motion, Seitz contended that Beck was either a public invitee or licensee on the Bank's property but not a trespasser. On the other hand, the Bank argued that the only evidence in this case was that Beck was a trespasser.

The trial court later issued a written memorandum decision in which it determined that Beck was a trespasser on the Bank's property. The trial court granted the Bank's motion for summary judgment.

*Standard of Review*

On appeal, Seitz contends that the trial court erred in determining that Beck was a trespasser on the Bank's property rather than a licensee or an invitee. An appellate court's standard of review in summary judgment cases is well established:

" ' "Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is

entitled to judgment as a matter of law. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. On appeal, we apply the same rules and where we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied." [Citations omitted.]' " *State ex rel. Stovall v. Reliance Ins. Co.*, 278 Kan. 777, 788, 107 P.3d 1219 (2005).

In reviewing the trial court's grant of summary judgment in this case, we must bear in mind that "summary judgments are to be granted with caution in negligence actions. [Citation omitted.]" *Fettke v. City of Wichita*, 264 Kan. 629, 632, 957 P.2d 409 (1998). Nevertheless, a defendant moving for summary judgment in a negligence case is entitled to prevail if the defendant shows there is no evidence indicating negligence. *Crooks v. Greene*, 12 Kan. App. 2d 62, 64-65, 736 P.2d 78 (1987).

*Elements of Negligence*

To recover for negligence in this case, Seitz had the burden to prove the existence of a duty, breach of such duty, injury, and a causal connection between the duty breached and the injury. The existence of a duty presents a question of law. Whether the duty has been breached presents a question of fact. *Reynolds v. Kansas Dept. of Transportation*, 273 Kan. 261, Syl. ¶ 1, 43 P.3d 799 (2002).

The duty owed by the Bank to Beck is determined by Beck's status on the land. Our Supreme Court in *Jones v. Hansen*, 254 Kan. 499, Syl. ¶ 2, 867 P.2d 303 (1994), held that "[t]he duty owed by an occupier of land to invitees and licensees alike is one of reasonable care under all the circumstances." In contrast, the duty owed by an occupier of land to trespassers is "to refrain from wilfully, wantonly, or recklessly injuring" the trespasser. 254 Kan. at 510.

*Beck's Status on the Bank's Property*

Citing *Gerchberg v. Loney*, 223 Kan. 446, 449, 576 P.2d 593 (1978), our Supreme Court in *Jones*, 254 Kan. at 503, defined an

invitee as " 'one who enters or remains on the premises of another at the express or implied invitation of the possessor of the premises for the benefit of the inviter, or for the mutual benefit and advantage of both inviter and invitee.' " 254 Kan. at 503. A licensee is defined as " 'one who enters or remains on the premises of another by virtue of either the express or implied consent of the possessor of the premises, or by operation of law, so that he [or she] is not a trespasser thereon.' " 254 Kan. at 503. In contrast, a trespasser is defined as " 'one who enters on the premises of another without any right, lawful authority, or an express or implied invitation or license.' " 254 Kan. at 503.

In its brief, Seitz contends that Beck was either a public invitee or a licensee on the Bank's property. Seitz argues that Beck was at least a licensee on the property because the Bank, by tacit consent and as a matter of general or local custom, extended to Beck and other pedestrians the privilege of using the shortcut across its property as a "mere personal favor." In addition, Seitz asserts that the Bank, by its location and its attractive landscape, extended an implied invitation to the public as potential new customers for the Bank to enter its property and use its facilities.

As discussed in more detail below, the problem with Seitz' arguments is that there was no evidence presented in response to the Bank's summary judgment motion which would show Beck's purpose on the property. The purpose of one's visit to the property determines his or her status as an invitee or licensee. See *Weil v. Smith*, 205 Kan. 339, 346, 469 P.2d 428 (1970); *Lemon v. Busey*, 204 Kan. 119, 122-23, 461 P.2d 145 (1969). Here, the only evidence that we have about the purpose of Beck's presence on the Bank's property was speculative testimony. Beck's daughter speculated that Beck was probably on his way to Hy-Vee to purchase cigarettes. Nevertheless, she admitted that she had no basis for this speculation and that she really did not know why Beck had left the house. Beck's daughter testified that Beck had never before walked to Hy-Vee and that he had never before visited the Bank.

It is well established that "[a] party opposing summary judgment may not rest merely on allegations, but must set forth specific facts to support its position." *Lloyd v. Quorum Health Resources, LLC*,

31 Kan. App. 2d 943, 954, 77 P.3d 993 (2003); see K.S.A. 60-256(e). Furthermore, "[t]he law is clear that 'an inference cannot be based upon evidence which is too uncertain or speculative or which raises merely a conjecture or possibility.' [Citation omitted.]" *Lloyd*, 31 Kan. App. 2d at 954. The evidence brought forward by Seitz in response to the Bank's summary judgment motion only created a mere conjecture or possibility that Beck was using the Bank's property as a shortcut or that Beck was there to conduct business with the Bank.

This determination is consistent with the trial court's findings in its memorandum decision. The trial court noted that Seitz had failed to bring forth any evidence that would support its speculation that Beck was on the Bank's property to conduct business with the Bank. The trial court stated that Seitz had presented "no evidence that Mr. Beck was on bank property to use the ATM, to cash a check, to open an account, or to otherwise conduct business with the bank." Determining that Seitz had failed to meet its burden on this issue, the trial court stated the following rule applicable to summary judgment cases: "If defendant presents facts sufficient to support the position taken in its motion for summary judgment, plaintiff must come forward with evidence that creates a genuine issue of material fact for a jury. Mere speculation is insufficient to avoid summary judgment. *Lambert v. [City of] Emporia*, 5 Kan. App. 2d 343[, 616 P.2d 1080] (1980)." The trial court further stated that Seitz was unable to establish what brought Beck onto the Bank's property.

In her brief, Seitz attempts to analogize the facts here with those in *Gardin v. Emporia Hotels, Inc.*, 31 Kan. App. 2d 168, 61 P.3d 732, *rev. denied* 275 Kan. 963 (2003). There, Gardin sued Emporia Hotels, Inc., after he was attacked and stabbed outside of its motel by a motel guest. Gardin and his brother had followed two women, whom Gardin's brother had met at a bar, to the parking lot of the motel. Gardin was not a hotel guest. Upon arriving in the parking lot of the motel, one of the women told Gardin's brother that she would return after she retrieved an item. The women appeared to enter a motel room. While waiting for the women to return to the parking lot, Gardin and his brother were approached by two men

who told them to leave because the women did not want to go with them. An argument developed, and Gardin attempted to leave the parking lot to walk to his apartment. Before Gardin could leave the parking lot, however, several men drove up and blocked his way. Gardin ran to the motel's entrance. Gardin asked the manager to let him inside the motel but the manager refused. Gardin was attacked by the men. One of the men who was a motel guest stabbed Gardin. 31 Kan. App. 2d at 169-70.

After Gardin filed suit, Emporia Hotels moved for summary judgment, arguing that Gardin was a trespasser at the motel and that the only duty owed to Gardin was to refrain from willfully or wantonly injuring him. The trial court granted summary judgment to Emporia Hotels, Inc., finding that Gardin was a trespasser at the motel and that Emporia Hotels, Inc., had no reason to be aware of any potential crime problems in the area and that the stabbing was not foreseeable. On appeal, this court determined that Gardin was not an invitee on the motel's premises. Nevertheless, this court determined that Gardin was arguably a licensee. This court cited Comment h to section 330 of the Restatement (Second) of Torts (1964) which states that a licensee includes persons

" 'whose presence upon the land is solely for his own purposes, in which the possessor has no interest, and to whom the privilege of entering is extended as a mere personal favor to the individual, whether by express or tacit consent or as a matter of general or local custom.' " 31 Kan. App. 2d at 174.

Noting that arguably a motel should expect people not intending to rent a room to enter its property, this court stated:

"People often gather in parking lots without intending to patronize the business that owns the parking lot. Gardin was waiting for a woman who appeared to have some connection with the motel. It could be argued that a motel should expect people will enter its property without intending to rent a room from the motel. However, a business owner would owe no higher duty to insure the safety of a licensee than that of a patron or customer." 31 Kan. App. 2d at 174-75.

This court then set forth the rule that a business owner does not insure the safety of its patrons or customers, unless circumstances indicate that the customers have a risk of peril beyond the ordinary. This court held that the motel manager had no warning that the motel guest who stabbed Gardin was violent and, under the totality

of the circumstances, had no duty to protect Gardin from the unforeseeable attack. 31 Kan. App. 2d at 175-76.

Importantly, this court in *Gardin* never determined that Gardin was a licensee on the motel's property. Instead, this court stated that Gardin was *arguably* a licensee and went on to determine that the motel had no duty to protect Gardin from the attack. Nevertheless, the facts of *Gardin* are distinguishable from the instant case. Gardin was waiting in the motel parking lot for an individual who apparently had some sort of connection with the motel. In the instant case, however, Seitz has not shown that Beck had any sort of connection with the Bank. The panel in *Gardin* noted that individuals often gather in parking lots without intending to patronize the business that owns the parking lot. The Bank points out that the area where Gardin was waiting and the motel's front entrance where he was later attacked were apparently constructed for and used by motel guests. Here, however, Seitz has not established nor can it be inferred that the grassy area which was adjacent to the retaining wall was an area constructed for use by patrons or an area where individuals commonly walked. There was no concrete walkway or other path constructed in that area. Moreover, in *Gardin*, the attacker was a motel guest. The Bank points out that in the instant case, there was no indication that a third party, let alone one who had a connection with the Bank, had any contact with Beck.

Nevertheless, Seitz maintains that this case is like *Gardin* because the Bank, by tacit consent or as a matter of general custom, extended to Beck and all pedestrians at that intersection the privilege of crossing their property as a "mere personal favor." Seitz contends that the Bank knew that people were using this area as a shortcut because the Bank's teller saw them. The evidence offered by Seitz to support its argument is Mountain's testimony where she indicated that she had seen individuals cutting through the grassy area east of the Bank three times in 4 years. In addition, Seitz points out that Knight acknowledged that individuals walk to and onto the Bank's property. Moreover, Seitz asserts that casual observation of the area shows that the public would use the Bank's property as a shortcut to the shopping center.

In addressing Seitz' argument that the Bank extended a "mere personal favor" to pedestrians to use the Bank's property as a short-cut, the trial court stated:

"[Seitz] offers no physical evidence that there was a 'general or local custom' for people to cross the grassy area, such as worn areas in the grass. The 'mere personal favor' the bank is alleged to have extended to Mr. Beck is the privilege of leaving a public sidewalk to cut thirty feet across a sloping, grassy hill, possibly to get to a shopping center far to the north and west of the bank."

The trial court then cited Section 332 of the Restatement (Second) of Torts (1964) and Comment d to that section as support for the Bank's position that it did not extend an implied invitation or give implied consent for Beck to enter the property. Section 332 defines an invitee as follows:

"(1) An invitee is either a public invitee or a business visitor.
"(2) A public invitee is a person who is invited to enter or remain on land as a member of the public for a purpose for which the land is held open to the public.
"(3) A business visitor is a person who is invited to enter or remain on land for a purpose directly or indirectly connected with business dealings with the possessor of the land."

## Comment d of Section 332 states:

"Where land is held open to the public, there is an invitation to the public to enter for the purpose for which it is held open. Any member of the public who enters for that purpose is an invitee. Anyone who enters for another purpose is not an invitee unless he falls under Subsection (3).

"Thus where a strip of private land abutting upon the public sidewalk is so paved that it is indistinguishable from the sidewalk, the possessor holds it open to the public as provided for public use for the purpose of passage, and anyone so using it is an invitee. The possessor's duty to use reasonable care to keep such land in proper and safe condition is not far removed from his obligation to the public upon the highway itself, or to those who stray a few feet from it in the course of travel.

"It is not enough, to hold land open to the public, that the public at large, or any considerable number of persons, are permitted to enter at will upon the land for their own purposes. As in other instances of invitation, there must be some inducement or encouragement to enter, some conduct indicating that the premises are provided and intended for public entry and use, and that the public will not merely be tolerated, but is expected and desired to come. When a landowner tacitly permits the boys of the town to play ball on his vacant lot they are licensees only; but if he installs playground equipment and posts a sign saying that the lot

is open free to all children, there is then a public invitation, and those who enter in response to it are invitees."

The trial court noted that the Bank's property over which Beck walked was not paved. In addition, the trial found nothing about that strip of land which induced or encouraged the public to enter.

Seitz contends that the trial court erred by relying on only Section 332 of the Restatement (Second) of Torts (1964) which relates only to invitees. Seitz points to Section 330 of the Restatement (Second) of Torts (1964) relating to licensees. Section 330 defines a licensee as "a person who is privileged to enter or remain on land only by virtue of the possessor's consent." Seitz refers to comment c of Section 330 relating to "consent" which states in part: "A mere failure to object to another's entry may be a sufficient indication or manifestation of consent, if the possessor knows of the other's intention to enter, and has reason to believe that his objection is likely to be effective in preventing the other from coming." Seitz maintains that the Bank knew that people used the shortcut across its property and that bushes or a fence would be effective to prevent pedestrians from using the shortcut.

Nevertheless, as discussed above, Seitz has not presented any evidence which could establish that Beck was using the Bank's property as a shortcut. Furthermore, the evidence could not establish that the Bank consented to Beck using the area on the east side of the Bank as a shortcut. Beck's sister indicated that Beck had not visited the Bank previous to the date of the December 2003 incident. Moreover, the Bank's employees were unaware of Beck's presence on its property until he was discovered lying in the drive-through area.

Seitz refers to comment f to Section 330 of the Restatement (Second) of Torts, which indicates that an individual can be a licensee when the possessor of land has sufficiently expressed consent to the entry of all others or a particular class on the land:

"If the possessor has, by word or conduct, sufficiently expressed his consent to the entry of all others or a particular class, it is immaterial whether the particular person entering knows or does not know of the acts or words by which this consent is expressed. So too, where it is local custom for possessors of land to permit others to enter their land for particular purposes, it is immaterial that the partic-

ular person entering is not a member of the local community, or, if a member of the local community, is ignorant of the custom."

Prosser and Keaton on The Law of Torts § 60, p. 413 (5th ed. 1984), includes within the common classes of licensees "those taking shortcuts across the property or making merely permissive use of crossings and ways or other parts of the premises." Section 58, p. 395-96, of Prosser and Keaton on The Law of Torts sheds further light on when trespassers using a shortcut across another's property become licensees:

"Where, to the knowledge of the occupier of the land, trespassers in substantial number are in the habit of entering it at a particular point, or of traversing an area of small size, the burden of looking out for them is reduced, and the risk of harm perhaps increased, so that many courts have held that there is a duty of reasonable care to discover and protect them in the course of activities which the defendant carries on. The typical case is that of a frequent use of a particular part of a railroad track, as where a 'beaten path' crosses it, which is held to impose a duty of reasonable care as to the operation of trains. . . . There has been some effort to explain the liability in such cases by saying that the defendant's continued toleration of the trespass amounts to permission to make use of the land, so that the plaintiff is not a trespasser but a licensee."

In this case, there was no evidence indicating that there was a habit of pedestrians using the grassy area on the east side of the Bank as a shortcut. In the 4 years that Mountain had worked as a teller in the drive-through area of the Bank, she had only witnessed three occasions where individuals were cutting across that area. Mountain testified that she was the only daytime teller at the Bank in those 4 years. Once this activity was reported to the Bank's vice president, Mountain was instructed to tell the people to stay out of that area. Mountain later followed through with the vice president's instructions by warning a man not to walk in that area. There was no indication that a custom had been established of pedestrians using the Bank's property as a shortcut and that the Bank had consented to this activity.

At oral arguments, Seitz contended that the Bank's vice president Knight had testified that people "regularly" or "all the time" crossed the Bank's property. Nevertheless, in reviewing the particular portion of Knight's testimony referenced by Seitz at oral ar-

gument, we find no evidence that people "regularly" or "all the time" crossed the Bank's property. Instead, Knight indicated in her testimony that people can and have walked from Hy-Vee across the Hy-Vee parking lot and south across the Bank's parking lot and then climbed the grassy slope south of the Bank to get to the sidewalk adjacent to Clinton Parkway. Importantly, Knight's testimony related to the area south of the Bank. In this case, however, Beck was found in the area east of the Bank. Moreover, the only information that we have about specific occurrences of people using the area east of the Bank as a shortcut is Mountain's testimony that she had seen people cutting across this area three times in 4 years. As discussed above, this testimony was not enough to establish a habit of pedestrians using the Bank's property as a shortcut and that the Bank had consented to this activity.

In determining that the Bank did not give its implied consent for Beck to enter the Bank's property, the trial court stated:

"For [Seitz] to survive summary judgment, [the] evidence must be 'significant probative evidence tending to support the complaint.' *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 290[, 20 L. Ed. 2d 569, 88 S. Ct. 1575] (1968). The court finds that the practical nature of the 'mere personal favor,' the lack of physical evidence of customary trespass, and the less-than-yearly occurrence of trespass is not significant probative evidence that would support a jury conclusion that it is a 'local custom' for the bank to extend the personal favor to the public to cross its property. Therefore, the court finds as a matter of law that the bank did not give its implied consent to Mr. Beck to enter its property."

We agree with the trial court's analysis on this issue. In responding to a motion for summary judgment, the nonmovant must come forward with evidence that is probative of that parties' position on a material issue of fact. *Kastner v. Blue Cross & Blue Shield of Kansas, Inc.*, 21 Kan. App. 2d 16, 25, 894 P.2d 909, *rev. denied* 257 Kan. 1092 (1995). "Probative evidence is that which 'furnishes, establishes or contributes toward proof.' [Citation omitted.]" *Saliba v. Union Pacific R.R. Co.*, 264 Kan. 128, 131, 955 P.2d 1189 (1998). Here, Seitz failed to bring forth evidence which was probative of its position that the Bank, through its conduct, had extended a "mere personal favor" to pedestrians to use its property as a shortcut. See *Committee for the First Amendment v. Campbell*, 962 F.2d

1517, 1521 (10th Cir. 1992) (Although evidence is viewed in the light most favorable to the party opposing a summary judgment motion, "it is not enough that the nonmovant's evidence be 'merely colorable' or anything short of 'significantly probative.' [Citation omitted.]").

Moreover, because Seitz did not bring forth evidence which could establish the purpose of Beck's visit to the property, it failed to create a genuine dispute as to whether Beck was a licensee or an invitee on the Bank's property. Beck's status on the Bank's property could be one of three classifications: (1) invitee; (2) licensee; or (3) trespasser. In order to establish that Beck was a licensee or an invitee on the Bank's property, Seitz needed to present evidence that would show Beck's purpose on the land. As discussed above, the purpose of one's visit to the land determines his or her status as an invitee or licensee. See *Weil v. Smith*, 205 Kan. 339, 346, 469 P.2d 428 (1970); *Lemon v. Busey*, 204 Kan. 119, 122-23, 461 P.2d 145 (1969). Nevertheless, the only evidence offered by Seitz as to Beck's purpose on the Bank's property was speculative testimony which would not support a reasonable inference that Beck was an invitee or licensee on the property. Because Seitz failed to bring forth probative evidence which could establish that Beck was a licensee or an invitee, the only option left is that Beck was a trespasser. As a result, we determine that the trial court was correct in deciding that Beck's status on the Bank's property was that of a trespasser.

## Foreseeability

One further point raised by Seitz should be mentioned here. In its brief, Seitz suggests that Beck was not a trespasser because Beck's presence on the Bank's property was foreseeable. Seitz maintains that the location of the Bank's property and its open and inviting landscape made public access to the property foreseeable and even welcomed. Nevertheless, Seitz fails to reference any Kansas case that uses "foreseeability" in analyzing whether an entrant is a trespasser. As the trial court properly pointed out, "foreseeability" does not determine an entrant's status under Kansas law. Rather, "foreseeability of harm" is one of the factors to be consid-

ered when determining whether the occupier of land exercises reasonable care under all of the circumstances. See *Jones v. Hansen*, 254 Kan. 499, Syl. ¶ 3, 867 P.2d 303 (1994). This factor is used after a determination has been made that an entrant's status on land is that of a licensee or an invitee.

Because Seitz failed to establish a genuine dispute as to whether Beck was a licensee or an invitee on the Bank's property, we affirm the trial court's grant of summary judgment in favor of the Bank.

Affirmed.