(198 P.3d 182)
No. 98,586

CATHY THOMAS, ADMINISTRATRIX OF THE ESTATE OF ANTHONY
D. STAPLETON, *et al.*, *Appellants*, v. THE COUNTY COMMIS-
SIONERS OF SHAWNEE COUNTY, KANSAS, *et al.*, *Appellees*.

Aff'd 293 Kan. ____, ____ P.3d ____ (2011).

Opinion filed December 12, 2008.

*Robert R. Laing, Jr.,* of Kansas City, for appellants.

*William A. Larson,* of Larson & Blumreich, Chartered, of Topeka, for appellees.

Before MARQUARDT, P.J., STANDRIDGE, J., and BUKATY, S.J.

STANDRIDGE, J.: In this jail suicide negligence action, the plaintiffs appeal the district court's decision to grant summary judgment in favor of the defendants. We affirm in part, reverse in part, and remand with directions.

### *Facts*

On October 22, 2002, Anthony D. Stapleton was taken into custody at the Shawnee County Department of Corrections Adult Detention Center (DOC). Stapleton was placed on suicide watch after he told jail staff that he had attempted suicide a few months prior to being incarcerated, that he felt he had "lost everyone," and that he wanted to die. Inmates in the suicide watch unit were considered an imminent risk for suicide and were required to be observed on a nearly continuous basis.

Jail staff moved Stapleton from suicide watch to the close observation unit after Stapleton reported that he was feeling much better and denied having any current suicidal ideation or plans. The close observation unit was intended for those inmates who were not imminently suicidal, but who possessed one or more suicide risk factors. DOC policy required officers in the close observation unit to conduct health and well-being checks every 15

minutes. Although close observation guards were not required to know whether an inmate had been suicidal in the past, guards were trained to treat all inmates in the close observation unit as if they possessed risk factors for suicide. Officers were also told that placement in the close observation unit represented that "someone possesses a risk factor, one or more risk factors, for suicide, but are not considered imminently suicidal."

After being placed in close observation, Stapleton was evaluated three times for risk of suicide, with the last evaluation occurring November 25, 2002. Each time he was evaluated, jail staff recommended that Stapleton remain in the close observation unit.

David Tipton was the guard on duty in the close observation unit on November 29, 2002. At approximately 9:05 a.m., Stapleton started an argument with another guard, Curtis Jones, over the size of Stapleton's jumpsuit. Jones called Matthew Biltoft, Tipton and Jones' supervisor, and stated that he thought Stapleton should be moved to suicide watch because Stapleton was a disciplinary problem. Jones' recommendation was consistent with the suicide prevention policy, which provided that a close observation inmate should be transferred to suicide watch if the inmate becomes seriously insubordinate or violent.

In addition to Jones, Tipton also told Biltoft that Stapleton should be transferred out of the close observation unit. In an affidavit filed after Stapleton's death, Tipton maintained that he—like Jones—thought Stapleton should have been moved to suicide watch because Stapleton was a disciplinary problem. Tipton's stated reason for the transfer was disputed by Father Joseph Chontos, who spoke with Tipton after the suicide occurred. According to Chontos, Tipton thought the move to suicide watch was necessary not because Stapleton was a disciplinary problem, but because Stapleton was a threat to himself.

After speaking with Tipton and Jones, Biltoft arrived at the close observation unit and talked with Stapleton about the incident. Although Stapleton appeared to almost begin crying during the conversation, Stapleton later seemed to calm down and relax. Without conducting a formal suicide screening, Biltoft determined that Sta-

pleton did not need to be transferred to suicide watch. Biltoft left the close observation unit.

At 10 a.m., Tipton saw that Stapleton had completed a shower and was proceeding to his room. According to Darrell Myrick, another inmate in the close observation unit, Stapleton was walking towards his room from the shower and, when he was about 15 feet from Tipton, Stapleton stated out loud that he was going to kill himself. Tipton stated he did not hear Stapleton's statement. Myrick claimed that Tipton was watching television and was not paying attention to the inmates at the time.

Once inside his cell, Stapleton obstructed his cell window with an artificial screen, which violated DOC policy. Tipton stated that every module at the DOC in which Tipton worked had permitted the inmates to briefly cover their cell windows when the inmates were using the restroom; thus, Tipton took no action to remove the screen from Stapleton's window.

Between 10:16 a.m. and 10:20 a.m., Stapleton's roommate reported that he was unable to open the door to his room. Tipton checked the door and found that Stapleton had hanged himself with a sheet. Tipton notified emergency personnel and immediately administered first aid to Stapleton. Stapleton ultimately was pronounced dead.

After Stapleton's death, three suicide letters were found in Stapleton's cell. The earliest was dated November 3, 2002. According to the suicide prevention policy, frequent shakedowns of each cell, at least one time per shift on the first and second shifts, were required in the close observation unit. There was no record that a shakedown of Stapleton's cell was ever completed.

Following the suicide, Cathy Thomas, the administratrix of Stapleton's estate, and Jennifer Mendez, next of kin and guardian of Stapleton's son (collectively "Thomas"), filed a lawsuit grounded in negligence against Biltoft, Tipton, and Betsy Gillespie (Director of the DOC), as well as County Commissioners Ted Ensley, Marice Kane, and Victor Miller individually and the Board of Shawnee County Commissioners as an entity ("Shawnee County") (collectively "Defendants"). Defendants ultimately filed a motion for summary judgment, which the district court granted. Thomas ap-

peals, arguing the district court erred in determining that each of the defendants were entitled to immunity from liability for any negligent acts.

### Analysis

The parties are well acquainted with the standards for summary judgment, and we will not repeat them here. See *Bracken v. Dixon Industries, Inc.*, 272 Kan. 1272, 1274-75, 38 P.3d 679 (2002) (setting forth the standards for summary judgment). Where there is no factual dispute, appellate review of an order granting summary judgment is de novo. *Cooke v. Gillespie*, 285 Kan. 748, 754, 176 P.3d 144 (2008).

In order to establish liability for negligence against a defendant, including a governmental agency, the plaintiff must establish: (1) The defendant owed a duty to the plaintiff; (2) the duty was breached; (3) the breach was the proximate cause of the plaintiff's injury; and (4) the plaintiff sustained damages. *Burney v. Kansas Dept. of SRS*, 23 Kan. App. 2d 394, 397, 931 P.2d 26 (1997). Whether a duty exists is a question of law, and our review is unlimited. See *Nero v. Kansas State University*, 253 Kan. 567, 571, 861 P.2d 768 (1993). If a duty exists, breach and causation are questions for the factfinder. See *Calwell v. Hassan*, 260 Kan. 769, 776, 925 P.2d 422 (1996).

### A. Defendants' Duty To Stapleton

There is no affirmative duty to protect an individual unless one can establish a special duty is owed to the injured individual. See *Potts v. Board of Leavenworth County Comm'rs*, 39 Kan. App. 2d 71, 80-81, 176 P.3d 988 (2008) (governmental agency owes duty to public at large and not to individual unless special relationship exists); Restatement (Second) of Torts § 314A (1964) (an individual has no duty to act for the protection of others unless a special relationship exists). Numerous Kansas cases have recognized that a custodial relationship is a special relationship which imposes on the custodian a special duty of care. Relevant to the issue of duty here, many of these cases relied on various sections within the Restatement (Second) of Torts to support the existence of such a

relationship. A brief review of these cases will be helpful to our determination regarding whether Defendants owed a special duty of care to Stapleton under the facts presented here.

In *Cansler v. State*, 234 Kan. 554, 675 P.2d 57 (1984), one of seven inmates who escaped from the penitentiary shot and severely wounded a police officer. The police officer sued the government, and the Kansas Supreme Court considered whether the government owed the officer a special duty to protect him from the escaped convicts. The court cited Restatement (Second) of Torts § 319 (1964), which provides that custodians who take control of a dangerous person owe a duty of reasonable care to prevent the dangerous person from harming others. Finding no Kansas decisions precisely on point, the court relied heavily on cases from outside jurisdictions to conclude that, pursuant to Restatement (Second) of Torts § 319, the State owed a duty of reasonable care to prevent the inmate from escaping and harming the officer. 234 Kan. at 559-64.

In *Washington v. State*, 17 Kan. App. 2d 518, 839 P.2d 555, *rev. denied* 252 Kan. 1095 (1992), Washington was in custody at the Lansing Correctional Facility when he got into a fight with Vaughn, another inmate. Both men were placed in special confinement. Vaughn made several threats against Washington in the presence of the prison guards. Upon release from special confinement, both men were assigned to the same cell block four cells away from each other, even though other empty cells were available. On this same day, Vaughn stabbed Washington in the eye, causing irreparable damage.

Washington sued the State for negligence, alleging that as agents of the State, the prison guards knew Vaughn would try to harm Washington, yet they assigned the two to the same cell block without warning and did not try to protect Washington. On appeal, a panel of our court concluded the State was under a special duty to prevent inmates from harming other inmates. In so concluding, the court applied Restatement (Second) of Torts § 320 (1964), which recognizes that, under certain circumstances, a person who has custody of another "is under a duty to exercise reasonable care so as to control the conduct of third persons as to prevent them

from intentionally harming the other or so conducting themselves as to create an unreasonable risk of harm." Like *Cansler*, *Washington* did not cite any Kansas cases directly on point but observed that nearly all extra-jurisdictional courts to have considered the matter held prison officials to a duty of care to safeguard a prisoner in their custody or control from attack by other prisoners. 17 Kan. App. 2d at 523.

In *C.J.W. v. State*, 253 Kan. 1, 853 P.2d 4 (1993), the plaintiff, a 12-year-old boy, was confined in a juvenile detention center when he was assaulted, raped, and sexually molested by another older youth named Randy, who also was confined at the juvenile detention center. SRS had a well-documented history of Randy's abuse towards younger boys, including a label as "rapist" by one youth facility. C.J.W. sued the State for negligence. The trial court granted summary judgment in favor of the State, finding no legal duty existed on the part of the State to protect C.J.W. from Randy.

On appeal, the Kansas Supreme Court reversed: "We have no hesitancy in concluding that §§ 315, 319, and 320 of the Restatement (Second) of Torts apply to this case and that the State not only had a duty to warn [regarding] Randy's propensities to commit violence but also to take reasonable steps to protect plaintiff from Randy." 253 Kan. at 12.

In *Jackson v. City of Kansas City*, 263 Kan. 143, 947 P.2d 31 (1997), officers arrested and handcuffed the plaintiff at the scene of a domestic incident but failed to protect him from his girlfriend, who slit his throat as he sat on the curb while the officers completed reports. The Kansas Supreme Court held that the officers owed a duty to the plaintiff to protect him from his girlfriend while he was handcuffed and unable to defend himself. 263 Kan. at 158-63. In so holding, the court relied on the Restatement (Second) of Torts § 320.

In finding that a custodial relationship imposes upon the custodian a special duty of care, each of the Kansas cases referenced above relied on various exceptions to the general rule set forth in the Restatement (Second) of Torts § 315 (1964) that, absent a special relationship, there is no affirmative duty to control the conduct of a third person to prevent such third person from causing

physical harm to another. More specifically, the cases above relied on the special relationship exceptions set forth in Restatement (Second) of Torts § 319 (those in charge of a third person having dangerous propensities have duty to control conduct of such dangerous third person toward another), and Restatement (Second) of Torts § 320 (those having custody of another have duty to control conduct of third person toward the one in custody). Notwithstanding the fact that, like the Kansas cases described above, Defendants had custody and control of Stapleton in this case, we find application of an alternate section of the Restatement is better suited to the unique facts presented here.

Like the general rule set forth in Restatement (Second) of Torts § 315 that there is no affirmative duty to control the conduct of a third person toward another, Restatement (Second) of Torts § 314 (1964), stands for the even broader proposition that, as a general rule, there is no duty to act for the protection of others, regardless of whether a third person is involved ("The fact that the actor realizes or should realize that action on his part is necessary for another's aid or protection does not of itself impose upon him a duty to take such action."). Restatement (Second) of Torts § 314A, however, goes on to identify special relationships that are excepted from this general rule and give rise to an affirmative duty to aid or protect:

"(1) A common carrier is under a duty to its passengers to take reasonable action
   (a) to protect them against unreasonable risk of physical harm, and
   (b) to give them first aid after it knows or has reason to know that they are ill or injured, and to care for them until they can be cared for by others.
"(2) An innkeeper is under a similar duty to his guests.
"(3) A possessor of land who holds it open to the public is under a similar duty to members of the public who enter in response to his invitation.
"(4) One who is required by law to take or who voluntarily takes the custody of another under circumstances such as to deprive the other of his normal opportunities for protection is under a similar duty to the other."

To a certain extent, subsection (4) of § 314A of the Restatement (duty to protect one in custody from unreasonable risk of physical harm) appears to overlap with § 320 (controlling conduct of third person toward one in custody). Given the facts presented here,

however, only Restatement (Second) of Torts § 314A(4) appears applicable. This is because, in this case, the risk of harm to the one in custody did not come from a third person, but instead it came from the one in custody himself. The comments to § 314A(4) specifically explain that a duty exists under these unique circumstances: "The duty to protect the other against unreasonable risk of harm extends to risks arising out of the [other's] own conduct . . . [or] from the negligence of the [other] himself." Restatement (Second) Torts § 314A, comment d.

No Kansas case has acknowledged the duty of a custodian to protect one in custody from physical harm *as set forth in subsection (4)* of the Restatement (Second) of Torts § 314A. With that said, numerous Kansas cases have acknowledged, *pursuant to subsection (3)* of the Restatement (Second) of Torts § 314A, the duty of one in possession of land to aid or protect members of the public invited onto the land. See *D.W. v. Bliss*, 279 Kan. 726, 732, 112 P.3d 232 (2005) (recognizing Restatement [Second] of Torts § 314A[3] imposes a duty upon one in possession of land); *Gragg v. Wichita State Univ.*, 261 Kan. 1037, 1045-46, 934 P.2d 121 (1997) (same); *Gardin v. Emporia Hotels, Inc.*, 31 Kan. App. 2d 168, 171-72, 61 P.3d 732, *rev. denied* 275 Kan. 963 (2003) (same). Thus, although not in the same context, Kansas has recognized and implemented § 314A of the Restatement (Second) of Torts.

Moreover, and in a factual scenario very similar to the one presented here, two cases from the United States District Court for the District of Kansas have specifically applied Restatement (Second) of Torts § 314A(4) to hold that prison officials owed inmates the duty to prevent self-harm. *Estate of Sisk v. Manzanares*, 262 F. Supp. 2d 1162, 1185-87 (D. Kan. 2002) (holding DOC and its personnel had independent legal duty to prevent prisoner from committing suicide); *Griffin v. United States*, 2000 WL 33200259 (D. Kan. 2000) (unpublished opinion) (holding United States Marshal Service had legal duty of care with respect to suicidal prisoner who escaped from custody and then committed suicide by jumping from the fourth floor atrium of United States courthouse). We note that in *Griffin*, Judge Vratil relied on the Kansas Supreme Court case of *Cansler*, 234 Kan. at 560-65, to conclude that Kansas would

recognize Restatement (Second) of Torts § 314A(4) as applied to suicidal inmates. In support of this conclusion, Judge Vratil specifically noted that Kansas generally relied on the Restatement in cases involving tort duties arising out of special relationships. 2000 WL 33200259, at *5.

In light of the language used in the Restatement (Second) of Torts § 314A(4), as well as the cases referenced above that have favorably cited both this and other relevant sections of the Restatement (Second) of Torts, we find § 314A(4) applicable to the facts presented and conclude, as a matter of law, that Defendants had a duty to protect Stapleton. More specifically, we hold that Defendants, as Stapleton's custodian, had a legal duty to take reasonable action to protect Stapleton against the risk of self-inflicted physical harm. Finding the existence of a legal duty, we now move on to determine whether any of the individual defendants knew or should have known that Stapleton was subject to an unreasonable risk of physical harm, which necessarily triggered this legal duty to act.

**B. *Did Thomas Submit Sufficient Evidence To Establish A Material Dispute Of Fact As To Whether Defendants Knew Or Should Have Known That Stapleton Was Subject To An Unreasonable Risk Of Physical Harm, Which Necessarily Triggered The Duty To Act?***

In granting summary judgment, the district court concluded as a matter of law that none of the individual defendants were required to affirmatively act to protect Stapleton. More specifically, the court concluded that Thomas failed in the summary judgment pleadings to allege material facts indicating any of the individual defendants knew or should have known that Stapleton was subject to an unreasonable risk of physical harm, which necessarily triggered the duty to act. Because an entity can only act through its employees and agents, the court then concluded Shawnee County did not have a duty to act either. On appeal, Thomas claims the district court erred in coming to these conclusions.

### 1. Whether Any Individual Defendants Knew Or Should Have Known Of Unreasonable Risk

Restatement (Second) of Torts § 314A, comment e, explains that "[t]he duty in each case is only one to exercise reasonable care under the circumstances. The defendant is not liable where he neither knows nor should know of the unreasonable risk." The question of whether any of the individual defendants knew or should have known that Stapleton was subject to an unreasonable risk of physical harm is a question of fact. See *Turner v. Railway Co.*, 85 Kan. 6, Syl., 116 P. 482 (1911) (Where an employee inexperienced in placing a dead engine on a round table and is crushed between two engines, the question whether injured railroad employee knew or should have known of danger in moving dead engine on a round table is question of fact for the jury and not one of law for the court.). Although a question of fact, if Thomas failed in the summary judgment pleadings to allege *any* material facts indicating that the individual defendants knew or should have known that Stapleton was subject to an unreasonable risk of physical harm, then there simply was no factual dispute and summary judgment in favor of those individual defendants was warranted. See *Sietz v. Lawrence Bank*, 36 Kan. App. 2d 283, 288, 138 P.3d 388, *rev. denied* 282 Kan. 791 (2006).

### a. David Tipton (In His Individual Capacity)

Thomas claims Tipton was negligent in guarding, supervising, and observing Stapleton immediately prior to Stapleton's suicide. In order to survive summary judgment on this claim, Thomas must come forward with evidence Tipton knew or should have known that there was a risk Stapleton would commit suicide.

The record on summary judgment reflects Stapleton received an initial mental health screening when he was first incarcerated at the DOC on October 22, 2002. Because the screening revealed no signs of a risk for suicide, Stapleton was placed in the general population. On October 23, 2002, Stapleton was again evaluated. This time, Stapleton divulged that he had attempted suicide within the last year by cutting his throat. As this information was communicated, Stapleton was crying and told the interviewer that he

was upset and scared. Although Stapleton indicated he was not currently thinking about killing himself, the decision was made to move Stapleton out of general population and place him in the close observation unit. Pursuant to the DOC suicide prevention policy, the close observation unit is intended for those inmates who—although not imminently suicidal—possess one or more suicide risk factors.

On October 24, 2002, Stapleton was again evaluated. Stapleton stated he had no family, he felt no one cared about him, and he felt like he wanted to die. After this evaluation, the decision was made to move Stapleton out of the close observation unit and place him in suicide watch. The DOC suicide prevention policy describes suicide watch as "[c]ontinuous supervision provided to an inmate who is considered to be at imminent risk for suicide."

Four days later, on October 28, 2002, another suicide risk assessment was conducted. Stapleton's mood was improved, he was not crying, and he was more upbeat. Stapleton stated he was feeling better and asked to be moved out of suicide watch. Based upon the recommendation of the social worker, Stapleton was moved out of suicide watch and back to the close observation unit.

Stapleton remained in the close observation unit up to the time of his death on November 29, 2002. During this approximately 30-day period, Stapleton received three more suicide screenings: November 7, November 23, and November 25, 2002. Based on the fact that Stapleton was not moved to general population after any of these screenings, it appears the DOC continued to view Stapleton as an inmate who possessed one or more suicide risk factors.

To more closely monitor those inmates who have been recognized by the DOC as individuals who possess one or more suicide factors, the DOC suicide prevention policy required officers in the close observation unit to conduct health and well-being checks every 15 minutes. Although close observation guards were not required to know whether an inmate had ever been considered an imminent risk for suicide or had actually tried to commit suicide in the past, guards were trained to treat all inmates in the close observation unit as inmates who possessed one or more risk factors for suicide. Director Gillespie testified that although a mentally

retarded inmate—who would be at greater risk of attracting predators—could be housed in the close observation unit, it would be rare that someone other than an inmate with suicidal issues would be placed there.

In the 7 days leading up to Stapleton's death, Defendants evaluated Stapleton's risk of suicide on two separate occasions and affirmatively decided to keep Stapleton housed in the close observation unit (designated by policy as the appropriate housing unit for inmates who possess one or more suicide risk factors) and not transfer him to the general population (the appropriate housing unit for inmates who do not possess suicide risk factors). We find the fact that Tipton knew Stapleton was housed in a unit designated by official policy as one for inmates who possess one or more suicide risk factors is sufficient, *in and of itself*, to create a dispute of material fact regarding whether Tipton knew or should have known there was a risk Stapleton would commit suicide.

Although our finding that conspicuous placement in a housing unit for inmates who possess one or more suicide risk factors is sufficient, in and of itself, to survive summary judgment on this issue as to Tipton, we find further support of a disputed material fact regarding whether Tipton knew or should have known of the risk Stapleton would kill himself based on the following evidence.

On the morning of the suicide, Tipton told his supervisor, Biltoft, that Stapleton should be transferred out of the close observation unit into suicide watch. In an affidavit filed after Stapleton's death, Tipton maintained that he—like Jones—thought Stapleton should have been moved to suicide watch because Stapleton was a disciplinary problem. This information, however, was disputed by Father Joseph Chontos, who spoke with Tipton after the suicide occurred. According to Chontos' affidavit filed in conjunction with the summary judgment motion, Tipton thought the move to suicide watch was necessary, not because Stapleton was a disciplinary problem, but because Stapleton was a threat to himself. Further supporting Father Chontos' assertion is Tipton's emotional exclamation, blurted out as Tipton was trying to resuscitate Stapleton: " 'I knew it, he should have went to [suicide watch].' " Viewed in a light most favorable to Thomas, we find this controverted testi-

mony creates a dispute of material fact regarding whether Tipton knew or should of known of the risk Stapleton would kill himself.

Moreover, the record demonstrates that prior to the 10 a.m. headcount, but after Tipton had told Biltoft that Stapleton should be transferred to suicide watch, Tipton saw that Stapleton had completed a shower and was proceeding to his room. According to Darrell Myrick, an inmate in the close observation unit, who also observed Stapleton walking from the shower to his room, Stapleton stated out loud that he was going to kill himself. Myrick testified Stapleton was only about 15 feet from Tipton at the time the statement was made but that Tipton was watching television and did not appear to be paying attention to the inmates at the time. Although Tipton denies hearing the statement, Myrick's sworn testimony regarding the limited amount of physical space between Tipton and Stapleton when the statement was made leads us to find further support of a disputed material fact regarding whether Tipton knew or should of known of the risk Stapleton would kill himself.

### b. Matthew Biltoft (In His Individual Capacity)

Thomas claims Biltoft was negligent in guarding, supervising, and observing Stapleton immediately prior to Stapleton's suicide. There is no dispute that Biltoft, like Tipton, knew Stapleton was housed in a unit designated by official policy as one for inmates who possess one or more suicide risk factors. We find Biltoft's knowledge of this fact, in and of itself, is sufficient to create a dispute of material fact regarding whether Biltoft knew or should have known there was a risk Stapleton would commit suicide.

In addition to claims of negligence in dealing with Stapleton, Thomas also claims Biltoft breached his duty of care to Stapleton in that he was negligent in the supervision of jail employees. More specifically, Thomas claims Biltoft failed to properly supervise Tipton and failed to ensure that jail employees were conducting required daily shakedowns of cells in the close observation unit.

Kansas recognizes claims of negligent supervision. *Marquis v. State Farm Fire & Cas. Co.*, 265 Kan. 317, 331, 961 P.2d 1213 (1998). *Marquis* declared that "[n]egligent supervision includes not

only the failure to supervise but also the failure to control persons with whom the defendant has a special relationship, including the defendant's employees or persons with dangerous propensities. [Citations omitted.]" 265 Kan. at 331. Our Supreme Court has also noted that the defendant must have reason to believe the employee's conduct would cause injury:

"When a third party asserts a negligent retention and supervision claim against an employer, liability results not because of the employer-employee relationship, but because the employer had reason to believe that an undue risk of harm to others would exist as a result of the employment of the alleged tortfeasor. The employer is subject to liability only for such harm as is within that risk. If, therefore, the risk exists because of the quality of the employee, there is liability only to the extent that the harm is caused by the quality of the employee that the employer had reason to believe would be likely to cause harm." *Kansas State Bank & Tr. Co. v. Specialized Transportation Services, Inc.*, 249 Kan. 348, 362, 819 P.2d 587 (1991).

Here, Thomas has failed to submit any evidence to establish that Biltoft knew or had reason to know that (a) jail employees failed to conduct required daily shakedowns; (b) Tipton conducted only partial health and well-being checks every 15 minutes; or (c) Tipton permitted inmates to cover the windows of their cells. Thus, Biltoft had no reason to believe that Tipton's employment, or the employment of any other employee in the jail over which Biltoft had supervisory authority, posed an undue risk of physical harm to Stapleton. Therefore, the district court correctly granted summary judgment in favor of Biltoft with respect to Thomas' claim of negligent supervision.

### c. Betsy Gillespie (In Her Individual Capacity)

Thomas claims Gillespie breached the duty of care owed to Stapleton in negligently training, monitoring, and supervising her employees. More specifically, Thomas asserts Gillespie inadequately trained supervisors and guards regarding suicide prevention rules and inadequately monitored supervisors and guards with regard to enforcement of the suicide prevention rules. Fatal to these claims for negligent supervision and training on summary judgment, however, is the fact that again, Thomas has failed to submit any facts to support the allegation that Gillespie had any reason to believe

the jail supervisors and guards were not properly trained and/or implementing suicide prevention rules. Thus, Gillespie had no reason to believe that jail supervisors and guards posed an undue risk of physical harm to Stapleton, and summary judgment in her favor on the negligent supervision and negligent training claims was appropriate.

### d. Ted Ensley, Marice Kane, and Victor Miller (In Their Individual Capacities)

Thomas asserts Commissioners Ted Ensley, Marice Kane, and Victor Miller breached their duty of care to Stapleton in negligently hiring and retaining Gillespie as director of the DOC.

Kansas imposes tort liability for damages caused by the negligent hiring and retention of an employee whom the employer knew or should have known to be unfit or incompetent. *Plains Resources, Inc. v. Gable*, 235 Kan. 580, 590-91, 682 P.2d 653 (1984).

"[T]he employer must, by virtue of knowledge of his employee's particular quality or propensity, have reason to believe that an undue risk of harm exists to others as a result of the continued employment of that employee; and the harm which results must be within the risk created by the known propensity for the employer to be liable." *Hollinger v. Stormont Hosp. & Training School for Nurses*, 2 Kan. App. 2d 302, 307, 578 P.2d 1121, *rev. denied* 225 Kan. 844 (1978).

Thomas alleges the individual commissioners were negligent in hiring Gillespie because Gillespie did not have a formal education or background in suicide prevention. However, prior to being hired at the DOC, Gillespie worked for several years in corrections and served as the warden of the Larned Correctional Mental Health Facility. At Larned, Gillespie worked with mental health staff and became very involved with the management of mentally ill inmates, some of which had suicidal tendencies. Even if Gillespie had not had these experiences, Thomas fails to suggest how a lack of formal education or background in suicide prevention rendered Gillespie incompetent to be the director of the DOC. Simply put, we find Thomas has submitted no evidence to support the assertion that Commissioners Ensley, Kane, or Miller would have had any reason to believe when they hired her that Gillespie was not qualified to run the DOC.

Next, Thomas claims the individual commissioners were negligent in retaining Gillespie. In support of this claim, Thomas states that prior to Stapleton's death, the DOC experienced two inmate suicides during Gillespie's tenure as director and that the individual commissioners failed to conduct a performance evaluation and/or required that Gillespie improve suicide prevention procedures. However, Gillespie testified that she maintained frequent contact with the commissioners following each suicide and discussed methods in which the suicide prevention policy could be enhanced. Moreover, Thomas has submitted no evidence to suggest that there were any deficiencies in the suicide prevention policy, only that the supervisors and guards failed to adequately adhere to the suicide prevention policies that were in place when Thomas died. Although the fact that there had already been two suicides in the DOC prior to Stapleton's may lead to an inference that there was a problem with the supervision of inmates, that inference—standing on its own—is insufficient to create a material dispute of fact regarding whether Commissioners Ensley, Kane, or Miller had reason to believe that Gillespie was not qualified to run the DOC.

Based on the discussion above, we conclude as follows:

- Thomas submitted sufficient evidence to establish a dispute of material fact regarding whether Tipton knew or should have known of the risk Stapleton would kill himself.
- Thomas submitted sufficient evidence to establish a dispute of material fact regarding whether Biltoft knew or should have known of the risk Stapleton would kill himself.
- Thomas failed to present sufficient evidence to establish a dispute of material fact regarding whether Biltoft had reason to believe that Tipton's employment, or the employment of any other employee in the jail over which Biltoft had supervisory authority, posed an undue risk of physical harm to Stapleton.
- Thomas failed to present sufficient evidence to establish a dispute of material fact regarding whether Gillespie had reason to believe that jail supervisors and guards posed an undue risk of physical harm to Stapleton.

- Thomas failed to present sufficient evidence to establish a dispute of material fact regarding whether Commissioners Ensley, Kane, or Miller had any reason to believe, either when they hired her or thereafter, that Gillespie was not qualified to run the DOC.

Accordingly, we find the district court erred in granting summary judgment in favor of defendants Tipton and Biltoft (in their individual capacities) but appropriately granted summary judgment in favor of defendants Gillespie, Ensley, Kane, and Miller (in their individual capacities).

### 2. Shawnee County

In addition to suing each defendant personally in his or her individual capacity, Thomas also sued (a) Shawnee County as an entity; and (b) each individual defendant in his or her official capacity. Official-capacity suits against an employee, officer, or agent generally represent only another way of pleading an action against the entity for which the employee, officer, or agent works. *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 690 n.55, 56 L. Ed. 2d 611, 98 S. Ct. 2018 (1978). "As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. [Citation omitted.]" *Kentucky v. Graham*, 473 U.S. 159, 166, 87 L. Ed. 2d 114, 105 S. Ct. 3099 (1985). Applying this principle to the case at hand, the court finds the suit against Tipton, Biltoft, Gillespie, Ensley, Kane, and Miller in their official capacities must be construed as a suit against Shawnee County.

Although common law dictates that a governmental entity cannot be sued without its consent, the Kansas Legislature provided this consent by enacting the Kansas Tort Claims Act (KTCA), K.S.A. 75-6101 *et seq. Woodruff v. City of Ottawa*, 263 Kan. 557, 561-62, 951 P.2d 953 (1997). Subject to certain limitations, the KTCA deems a governmental entity liable for the negligent acts of those employees acting within the scope of their employment. K.S.A. 2007 Supp. 75-6103(a). Here, we have determined that Thomas failed to establish a factual basis for finding that the duty

to act had been triggered as to defendants Gillespie, Ensley, Kane, and Miller. Clearly, Shawnee County (as an entity) cannot be deemed liable for nonexistent negligent acts performed by these individuals.

On the other hand, we have determined that Thomas sufficiently established a factual basis for finding that the duty to act had been triggered as to defendants Tipton and Biltoft. Moreover, the facts demonstrate that both Tipton and Biltoft were acting within the scope of their employment. Thus, at least pursuant to the provisions of K.S.A. 2007 Supp. 75-6103(a), Shawnee County (as an entity) is liable for the negligent acts of Tipton and Biltoft.

Although liability is the general rule, the KTCA specifically sets forth exceptions to liability for negligent acts. See K.S.A. 2007 Supp. 75-6104. Shawnee County asserts two of these exceptions renders it immune from liability:

- K.S.A. 2007 Supp. 75-6104(d) (personnel policy exception), which provides immunity for government employees who fail to enforce a written personnel policy protecting a person's health or safety unless a duty of care independent of such policy is owed to the specific individual injured; and
- K.S.A. 2007 Supp. 75-6104(e) (discretionary function exception), which bars claims against a government entity or employee "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a governmental entity or employee, whether or not the discretion is abused and regardless of the level of discretion involved."

Significantly, and as explicitly set forth in the statute itself, the personnel policy exception is not applicable in those situations where the governmental defendant owes an independent legal duty to the injured party. Likewise, our Supreme Court has held that "the discretionary function exception [under K.S.A. 75-6104(e)] is not applicable in those situations where a legal duty exists, either by case law or by statute, which the governmental agency must follow." *Barrett v. U.S.D. No. 259,* 272 Kan. 250, 263, 32 P.3d 1156 (2001); see *Nero v. Kansas State University,* 253 Kan. 567, 585, 861 P.2d 768 (1993) ("If there is a clearly defined mandatory duty

or guideline, the discretionary function exception is not applicable."); see also *Cansler v. State*, 234 Kan. 554, 570, 675 P.2d 57 (1984) (holding that discretionary immunity does not apply where plaintiff alleged facts that, if true, constituted a breach of State's duty of reasonable care).

Notably, we already have determined that pursuant to the Restatement (Second) of Torts § 314A(4) (1964), Tipton, Biltoft, and Shawnee County (acting by and through its employees Tipton and Biltoft) owed an independent duty of reasonable care to prevent Stapleton from harming himself. Given this independent duty, we find Tipton, Biltoft, and Shawnee County's claims of immunity based upon enforcement of a written personnel policy and upon exercise of a discretionary function to be without merit. As such, we further find the district court erred in concluding that Tipton, Biltoft, or Shawnee County (as an entity) were immune pursuant to the exceptions set forth in K.S.A. 2007 Supp. 75-6104(d) and (e). For these reasons, we remand for trial on the issues of breach, causation, and damages with regard to these three defendants.

Affirmed in part, reversed in part, and remanded with directions.