No. 119,200

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STEPHEN M. DETERS and DONNA K. DETERS,
*Appellants*,

v.

NEMAHA-MARSHALL ELECTRIC COOPERATIVE ASSOCIATION, INC.,
and ALLIANCE INDEMNITY COMPANY,
*Appellees*.

SYLLABUS BY THE COURT

1.

Under K.S.A. 60-513(b), it is the last original wrongful act giving rise to the cause of action, not the last contact between the plaintiff and defendant that starts the running of the statute of repose clock. The statute of repose time limits do not restart simply because the defendant interacted with the plaintiff after completing the original negligent act.

2.

Parties will not avoid summary judgment when their arguments are based on supposition and conjecture. Parties must state facts based in evidence to support their position and avoid summary judgment.

3.

Courts will not consider a party's self-serving affidavit that conflicts with earlier deposition testimony when the party is using the affidavit to avoid summary judgment.

1

4.

Insurance companies have a duty to make a good-faith investigation of the circumstances surrounding a claim before refusing to pay a claim. When considering whether insurance companies acted in good faith, courts must consider the circumstances under which the insurer was investigating the claim.

5.

Insurance companies cannot be held to have acted in bad faith in denying a claim where plaintiff fails to establish damage to his or her property.

Appeal from Nemaha District Court; JOHN L. WEINGART, judge. Opinion filed May 24, 2019. Affirmed.

*William C. O'Keefe*, of O'Keefe Law Office, of Seneca, for appellants.

*Glenda Cafer* and *Terri Pemberton*, of Cafer Pemberton LLC, of Topeka, for appellee Nemaha-Marshall Electric Cooperative Association, Inc.

*Joel W. Riggs*, of Larson & Blumreich, Chartered, of Topeka, for appellee Alliance Indemnity Company.

Before LEBEN, P.J., GREEN and POWELL, JJ.

GREEN, J.: Stephen M. Deters and Donna K. Deters appeal from the judgment of the district court granting Nemaha-Marshall Electric Cooperative Association, Inc.'s (Nemaha-Marshall) and Alliance Indemnity Company's (Alliance) respective motions for summary judgment. On appeal, the Deters argue that the district court erred by ruling that their claims against Nemaha-Marshall were barred under the statute of repose, K.S.A. 60-513(b). The Deters further argue that the district court erred by ruling that their homeowner's insurance policy with Alliance did not cover their claims for damages.

2

Nevertheless, we conclude that the Deters' arguments are unpersuasive. As a result, we affirm the district court's orders of summary judgment.

*Uncontroverted Facts*

The following facts are uncontroverted for purposes of this appeal: The Deters live in Nemaha County, Kansas, and receive electricity from Nemaha-Marshall. Stephen has lived on the same land in Nemaha County his entire life.

In 1994, the Deters bought a "Ronk GTS" from Nemaha-Marshall. A GTS "allows a customer to safely connect a generator to his or her household wiring." Thus, if the utility power goes out, or a utility customer simply wants to use the generator, the utility customer has a generator backup. Nemaha-Marshall installed the GTS at the Deters' electric pole. Although Nemaha-Marshall installed the GTS, the Deters owned the GTS outright.

While living in their current house, the Deters started constructing a new house on their land. The Deters purchased and installed a heat pump in the new house in 1998 (original heat pump). The Deters also purchased and installed an oven, microwave, dishwasher, washing machine, and dryer in the new house in 1999.

In January 2000, the Deters moved into the new house. In the summer of 2000, the Deters removed their old house from their land. In addition to their new house, the Deters had a shop, implement shed, and a partial barn on their land. The new house, shop, and implement shed all received electricity.

Nemaha-Marshall connected the GTS to the shop and implement shed sometime in 1994 or 1995. Nemaha-Marshall connected the GTS to the new house sometime

3

between 1996 and January 2000. Nemaha-Marshall charged the Deters for labor, a truck roll, and pigtails—a term for a device used to connect electrical wires—on November 7, 1997. Nemaha-Marshall never charged the Deters for work related to the GTS following 1997.

On May 28, 2010, the Deters' original heat pump stopped working. They installed a new heat pump on September 27, 2010. The Deters believed that this heat pump was defective. In October 2011, the Deters replaced this heat pump with another heat pump. Thus, the heat pumps were replaced twice: Replacement heat pump #1 and replacement heat pump #2.

After their original heat pump stopped working in May 2010, the Deters filed an insurance claim with their insurer Alliance. The Deters alleged that an electrical event damaged the original heat pump. At first, the Deters asserted that the wiring on the original heat pump caused the heat pump to fail from low voltage. Eventually, though, the Deters asserted that lightning damaged the original heat pump.

Ghattas Bitar, an independent engineer retained by Alliance, examined the heat pump's compressor, as well as photos of the heat pump. Bitar explained that the heat pump showed no signs of suffering an "electrical surge event." Instead, there were "signs of arcing and copper globules/balls . . . on the rotor and the stator of the compressor indicating severe failure of the windings insulation." Bitar determined that "the failure of the windings' insulation was due to the compressor running hot as a result of low level of refrigerant." Based on this, Bitar concluded that the heat pump underwent "prolonged electrical failure" while running on low refrigerant, ultimately resulting in the pump's failure.

Alliance denied the Deters' claim. Alliance notified the Deters that their homeowner's insurance policy did not cover the damage to the original heat pump under

4

Section 1—Perils Insured Against:  A. Coverage A—Dwelling and Coverage B—Other Structures, (6)(a) and (b), which stated that Alliance did not cover losses caused by "[w]ear and tear, marring, deterioration" or "[m]echanical breakdown . . . ."

The Deters also experienced some problems with some appliances during 2010. "[B]y November 2010," an electrical event damaged the Deters' oven, microwave, dishwasher, washing machine, and dryer. The Deters replaced only some of their appliances.

On January 16, 2013, the Deters made a claim against Alliance for replacement of heat pumps #1 and #2. The Deters alleged that they were entitled to compensation for damage to the replacement heat pumps from low voltage. Since Alliance denied the Deters' claim for damage on their original heat pump, the Deters had purchased an equipment breakdown policy.

Derek Geer, an independent engineer retained by Alliance, examined replacement heat pump #2. This was the only heat pump available for examination since the company the Deters bought replacement heat pump #2 from had already removed replacement heat pump #1. Geer determined that "[n]o indications of low voltage were observed." Geer noted that the Nemaha-Marshall's "electronic monitors have reported no low voltage events . . . ." He noted that there "was no electrical or physical damage observed in the heat pump control compartment." Moreover, he explained that the heat pump's voltage output was normal when he tested it while running other equipment. Geer determined that any issues with replacement heat pump #2 would resolve upon further breaking in of the new unit and installing a "hard start kit," which added "capacitance to the circuit."

In September 2013, while the Deters' insurance claim was still pending, Stephen Deters opened the cover of the GTS. When he did this, he discovered that some load wire

5

connections to the GTS were burned. Based on discoloration of some wires, he also believed that there was evidence of a repair attempt.

On September 17, 2014, at the Deters' request, Nemaha-Marshall replaced the old GTS with a new GTS.

On October 9, 2014, Alliance denied the Deters' pending claim, asserting that they had no coverage under the homeowner's insurance policy for low voltage events. Alliance explained that under the provision on dwellings, their homeowner's insurance policy excluded coverage caused by faulty, inadequate, or defective design, workmanship, repair, construction, or material used in repair or maintenance. It asserted that under the provision on personal property, their homeowner's insurance policy did not include coverage on improper wiring. Moreover, Alliance asserted that the low voltage events did not constitute an "accident" as meant under the Deters' equipment breakdown policy.

On March 16, 2015, the Deters sued both Nemaha-Marshall and Alliance for damages related to the heat pumps and appliances. The Deters argued that Nemaha-Marshall's negligent wiring of the GTS resulted in the destruction or damage of their heat pumps and appliances. In their petition, the Deters alleged that Nemaha-Marshall was negligent from the moment it connected the GTS to their new house. The Deters also argued that Alliance was liable because Bitar and Geer "failed to examine the [GTS] or take any measurements from the connection box to determine if there exist[ed] a cause for low voltage events, and if such low voltage events could be related to how the wires were connected in the connection box." As a result, the Deters argued that Nemaha-Marshall and Alliance were jointly and severally liable for over $50,000 of damages relating to the original heat pump, the replacement heat pumps, and appliances.

During discovery, the Deters hired Cris Neagele as their electrical engineer expert. According to Neagele, Nemaha-Marshall's improper wiring of the GTS caused the

6

damage to the Deters' original heat pump and appliances in 2010. Neagele opined that Nemaha-Marshall crimped wires, placed the wires in pigtails, and then inserted the wires in lugs not designed to fit those particular wires. He explained that this practice could "cause excessive heating, corrosion, and high resistance point, which may cause a voltage drop during periods of high current draw." Neagele also believed that discoloration on some wires suggested that somebody had removed, cleaned, and replaced the wires at least once in the past.

During Stephen's deposition, Stephen testified to the following: He testified that he believed Nemaha-Marshall's wiring was responsible for the damage to his original heat pump, replacement heat pumps, and appliances. He testified that the first time he learned about the problem with the GTS was when he opened it in September 2013. He stated that he had no memory of "a service call out to [his] house" where Nemaha-Marshall electrical workers inspected the GTS. He explained that the company from whom he bought replacement heat pump #1 replaced it with replacement #2 at no cost. As a result, he did not have to pay for replacement #2. He explained that since the installation of the "hard start kit" and the new GTS, he had experienced no problems with replacement heat pump #2. He testified that he was unaware of any physical damage to the replacement heat pumps.

Nemaha-Marshall and Alliance moved for summary judgment against the Deters.

*Nemaha-Marshall's Summary Judgment Motion*

Nemaha-Marshall asserted that even if it were negligent in installing multiple wires in a lug not designed for multiple wires, it was still entitled to summary judgment under the 10-year statute of repose, K.S.A. 60-513(b). Nemaha-Marshall noted that it installed the GTS in 1994, connected the GTS to the shop and implement shed sometime in 1994 and connected the GTS to the new house sometime between 1996 and January

7

2000. But the Deters did not file their petition alleging that its negligent installation of the GTS harmed their heat pumps and appliances until March 16, 2015. Nemaha-Marshall argued that even if it connected the GTS to the new house in January 2000, the Deters brought their action more than 15 years after its last negligent act giving rise to the Deters' cause of action in this case.

The Deters responded that the district court should deny Nemaha-Marshall's motion because Nemaha-Marshall worked on the GTS in February 2007 and in September 2007 while in Stephen's presence. As a result, the Deters contend that K.S.A. 60-513(b)'s 10-year statute of repose would have started running in September 2007, not January 2000. The Deters produced a Nemaha-Marshall utility meter readout summary from February 2007 and a Nemaha-Marshall invoice for "the antenna wire," dated September 27, 2007, in support of this contention. The Deters also relied on statements made by Stephen in a sworn affidavit about (1) Nemaha-Marshall checking his utility meter and finding no problems in February 2007; and (2) Nemaha-Marshall "check[ing] connections" in September 2007. He further alleged in his affidavit that he saw Nemaha-Marshall employees working on the GTS during the February 2007 service call. Stephen asserted that Nemaha-Marshall came both in February and September 2007 on his request because they had been experiencing brown outs and the heat pump was failing.

Stephen signed the sworn affidavit following his deposition testimony and about a month after Nemaha-Marshall moved for summary judgment.

The district court ultimately granted Nemaha-Marshall's motion for summary judgment:

"In the present case, the Deters' negligence action against Nemaha Marshall is [] barred by the 10-year statute of repose as set forth in K.S.A. 60-513(b). According to the Deters, Nemaha Marshall improperly installed multiple wires or conductors in a lug inside the

8

Ronk GTS that was not designed for multiple wires when Defendant provided and installed that piece of equipment at the Deters Property and that such act caused Plaintiffs' property loss. According to Mr. Deters' sworn testimony, he purchased the Ronk GTS, or disconnect switch, from Nemaha Marshall in 1994 and it was placed on the electric pole at the Deters Property when that pole was installed by Nemaha Marshall in 1994. According to Mr. Deters, Nemaha Marshall connected the electric lines running from the Shop or Garage and from the Implement Building or Shed on the Deters Property to the Ronk GTS in 1994 or January 1995. Mr. Deters also testified that Nemaha Marshall connected the electric lines running from the Existing House to the Ronk GTS sometime between 1996 and January 2000, when the Deters moved in their Existing House. While Nemaha Marshall's business records indicate that the Deters were charged for pigtails, and/or labor and a truck roll to the Deters Property in 1997, and that the pigtails charged to the Deters are consistent with parts that could be placed in a GTS or disconnect box, it has no business records that would indicate that it connected the electric lines running from the buildings located on the Deters Property to the Ronk GTS. However, for the purposes of this motion for summary judgment, even if Mr. Deters' testimony is assumed to be true, then Nemaha Marshall's alleged negligent act occurred when Nemaha Marshall allegedly connected the lines running from the Shop or Garage, Implement Building or Shed, and the Existing House to the lug inside the Ronk GTS, or disconnect box, and the latest that such act was done would have been when the Deters moved into their Existing House in January 2000. Plaintiffs did not file their negligence action against Defendant until March 16, 2015, which was more than 15 years after the alleged original wrongful act. Accordingly, Plaintiff's negligence action against Defendant in this case is barred by the 10-year statute of repose as set forth in K.S.A. 60-513(b)."

Next, the Deters moved the district court to alter or amend its summary judgment ruling. The Deters asserted that the district court should reverse its summary judgment ruling based on *Bonnette v. Triple D Auto Parts Inc.*, 55 Kan. App. 2d 130, 136-37, 409 P.3d 865 (2017), a premises liability case in which this court held that the statute of repose time limits started to run the last day the landowner-defendant could have breached its duty. 55 Kan. App. 2d at 136-37. Then, the Deters pointed to their interactions with Nemaha-Marshall in 2007 to argue that it filed its petition within the

9

statute of repose time limits. The Deters also stated that Nemaha-Marshall "should be estopped to claim the statute of repose."

The district court denied this motion (1) because it maintained that its original ruling was correct and (2) because *Bonnette*, as a premises liability case, did not apply.

*Alliance's Summary Judgment Motion*

Alliance argued that it was entitled to summary judgment because the Deters' homeowner's insurance policy excluded coverage for damage to the original and replacement heat pumps. In making this argument, Alliance relied on the same provisions of the homeowner's insurance policy and equipment breakdown policy as it did when it denied the Deters' claim for the replacement heat pumps.

The Deters responded that the district court should deny Alliance's motion because "any reasonable person would believe that [] the continuing losses between 2010 and 2013, all occurring in the same manner and symptom, were the direct physical loss from the same cause, regardless [of] the type of policy coverage in place at the time." The Deters also asserted that Alliance ignored that it had a duty to discover the improper wiring within the GTS when they filed a claim for the failure of the original heat pump.

In the end, the district court granted Alliance's motion. Regarding the original heat pump, as well as the appliances, the district court determined that the Deters were not entitled to coverage under their homeowner's insurance policy because of the following: (1) the Deters never established a direct physical loss to the property as required by their homeowner's insurance policy; and (2) the Deters' homeowner's insurance policy excluded damage from faulty workmanship. The district court further asserted that the evidence the Deters used to support the alleged damage to the original heat pump and appliances was speculative. Regarding replacement heat pumps #1 and #2, the district

10

court ruled that the Deters were not entitled to coverage under their homeowner's insurance policy because "there [was] no evidence that anything ever happened to damage the replacement heat pumps."

Next, the Deters moved the district court to alter or amend its ruling, arguing the district court had not sufficiently addressed if Alliance adequately investigated their claims. The district court denied the Deters' motion, ruling that Alliance had "no legal duty to inspect [the Deters'] property and discover problems in [the Deters'] wiring system."

The Deters appealed the district court's granting of Nemaha-Marshall's and Alliance's motion for summary judgment.

*Did the District Court Err by Granting Nemaha-Marshall's Motion for Summary Judgment?*

On appeal, the Deters attempt to controvert the facts submitted by Nemaha-Marshall as to when it last worked on the GTS (January 2000), arguing that the last time Nemaha-Marshall worked on the GTS was in dispute because it had worked on the GTS in 2007. As a result, they contend that this restarted the statute of repose time limitations. The Deters conclude that the district court erred by granting Nemaha-Marshall's summary judgment motion because "Nemaha-Marshall's adjustments to the [GTS in 2007] allowed the restart of the statute of repose."

Nemaha-Marshall responds that any 2007 contacts with the Deters are irrelevant because the Deters' cause of action stems from their negligent wiring of the GTS, which occurred no later than January 2000. Nemaha-Marshall also contends that the Deters distort both the facts and caselaw in making their argument that the statute of repose started to run in 2007.

11

*Standard of Review*

When reviewing an order of summary judgment, we apply the following standard of review:

> """Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. On appeal, we apply the same rules and when we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied."' [Citation omitted.]" *Patterson v. Cowley County, Kansas*, 307 Kan. 616, 621, 413 P.3d 432 (2018).

When the facts are uncontroverted, we exercise de novo review while considering the district court's granting of a summary judgment motion. *Martin v. Naik*, 297 Kan. 241, 246, 300 P.3d 625 (2013).

Generally, courts should grant summary judgment in negligence cases only when the question presented involves a question of law. 297 Kan. at 245. Whether the statute of repose applies is a question of law over which this court exercises unlimited review. *Dunn v. U.S.D. 367*, 30 Kan. App. 2d 215, 218, 40 P.3d 315 (2002).

*Statute of Repose*

K.S.A. 60-513 provides:

> "(a) The following actions shall be brought within two years:
>
> . . . .
>
> (4) An action for injury to the rights of another, not arising on contract, and not herein enumerated.
>
> . . . .
>
> "(b) Except as provided in subsections (c) and (d), the causes of action listed in subsection (a) shall not be deemed to have accrued until the act giving rise to the cause of action first causes substantial injury, or, if the fact of injury is not reasonably ascertainable until some time after the initial act, then the period of limitation shall not commence until the fact of injury becomes reasonably ascertainable to the injured party, *but in no event shall an action be commenced more than 10 years beyond the time of the act giving rise to the cause of action.*" (Emphasis added.)

In the past, this court has explained the function of the statute of repose:

> "A statute of repose limits the time during which a cause of action can arise and usually runs from the act of the alleged tortfeasor. A statute of repose abolishes the cause of action after the passage of time, even though the cause of action may not have yet accrued." *Bonnette*, 55 Kan. App. 2d 130, Syl. ¶ 3.

The parties agree that the Deters' claim against Nemaha-Marshall is an action for injury not arising under contract that falls under K.S.A. 60-513(a)(4). Moreover, for purposes of this appeal, Nemaha-Marshall concedes (1) that it negligently installed the Deters' GTS and (2) that its negligence led to damaging the Deters' heat pumps and appliances. But the parties disagree on what act constituted the last act giving rise to the Deters' cause of action.

13

The Deters contend that this last act occurred in 2007. The Deters believe that the utility meter readout from February 2007 and the antenna wire invoice from September 2007 established that Nemaha-Marshall conducted work on the GTS in 2007. The Deters admit that they never physically saw Nemaha-Marshall work with the GTS wires in 2007. Instead, they contend that Neagele's opinion that someone removed, cleaned, and reinserted the wires in the GTS at some point, supports that the last act occurred in 2007: "Nemaha-Marshall had then been effectively working with [the] wires and pigtails" given Neagele's opinion that the wires had been cleaned and removed at some point. As a result, the Deters argue that their March 2015 petition was timely because they filed it within 10 years of 2007.

Significantly, in making this argument, the Deters never dispute that Nemaha-Marshall first negligently wired the GTS no later than January 2000. Indeed, even in his disputed affidavit, Stephen states that his house was experiencing "low voltage events" before Nemaha-Marshall's February 2007 visit. Thus, we know that the Deters were experiencing low voltage events before Nemaha-Marshall even returned to the Deters' house in 2007 following the initial installation of the GTS. Even so, the Deters ask this court to start the clock for the statute of repose purposes on a date other than when Nemaha-Marshall originally negligently wired the GTS.

But K.S.A. 60-513(b) and our caselaw does not support this interpretation. Under Kansas law it is the last act giving rise to the cause of action, not the last contact between the plaintiff and defendant, that starts the running of the statute of repose clock: "[B]ut in no event shall an action be commenced more than 10 years beyond *the time of the act giving rise to the cause of action*." (Emphasis added.)

In *Admire Bank & Trust v. City of Emporia*, 250 Kan. 688, 698, 829 P.2d 578 (1992), for example, our Supreme Court held: "The plain language of [K.S.A. 60-513(b)] and the applicable case law require that . . . a negligence action must be brought within

14

10 years of *the original wrongful act* or the action is barred." (Emphasis added.) 250 Kan. at 698. In *Dobson v. Larkin Homes, Inc.*, 251 Kan. 50, Syl. ¶ 1, 51, 832 P.2d 345 (1992), our Supreme Court repeated this exact holding. Moreover, the *Dobson* case is factually similar to this case. The Dobsons sued their home builder and insurance carrier for the negligent construction of their house. The district court granted the home builder's motion for summary judgment based on the statute of repose. Our Supreme Court upheld the district court's order because the Dobsons sued more than 10 years after the home builder constructed the house. 251 Kan. at 53.

As a result, Kansas caselaw underscores the point that parties must bring their negligence action within 10 years of the original wrongful act. Despite the preceding caselaw, the Deters cite three cases they believe support their contention that statute of repose "restart[ed]" in 2007: *Bonnette*, 55 Kan. App. 2d 130; *Kaminski v. United States*, 218 F. Supp. 3d 1251 (D. Kan. 2016); and *Dunn*, 30 Kan. App. 2d 215. These cases do not support their argument.

In *Bonnette*, Bonnette tripped on an unmarked step outside Triple D's store. The district court granted Triple D's summary judgment motion based on the statute of repose because Triple D purchased the store some 25 years earlier. The *Bonnette* court reversed the district court's summary judgment ruling, holding:

> "A landowner or proprietor has an ongoing duty to warn of nonopen and nonobvious dangerous conditions on the premises. Under the facts presented, the last day the defendant could have breached this duty was the day the plaintiff was injured. Accordingly, the plaintiff's claim for failure to warn was not barred by the statute of repose." 55 Kan. App. 2d 130, Syl. ¶ 5.

In *Dunn*, a plate glass door injured two students, but the school installed the door over three decades earlier. The school district moved for relief under the statute of repose. This court rejected the school district's argument, determining (1) that the school

breached its duty to keep its students safe and (2) that the school's breach of duty was the last wrongful act for statute of repose purposes. 30 Kan. App. 2d at 220.

In *Kaminski*, Kaminski fell on ice in a United States Post Office parking lot while trying to enter the Post Office. Kaminski sued the United States for negligence. The United States moved for summary judgment, arguing that the statute of repose barred Kaminski's suit because the downspout that caused the accumulation of ice Kaminski fell on had been in the same place for years. The *Kaminski* court rejected the United States' statute of repose argument because Kaminski presented reasonable evidence that the drainage conditions in the parking lot had not existed in its current manner for the last 10 years. 218 F. Supp. 3d at 1266.

Unlike this case, *Bonnette*, *Dunn*, and *Kaminski* are premises liability cases. The caselaw on regular negligence actions differ from the caselaw on premises liability negligence actions because in premises liability cases, the landowner or proprietor has an ongoing duty to warn people of dangers on their land. The landowner or proprietor's ongoing duty to warn people of dangers on their land extends what date a cause of action accrues because it is the breach of the duty that creates the cause of action. But the premises liability circumstances do not exist here. Nemaha-Marshall is not a landowner that has a duty to warn the Deters of some danger on its property. Simply put, the premises liability cases the Deters rely on are distinguishable from their case.

Moreover, the Deters misconstrue *Kaminski*. The Deters contend that their case is much like *Kaminski* because a genuine issue exists about when Nemaha-Marshall altered the wires in the GTS. The Deters contend that their evidence that Nemaha-Marshall altered the wires in 2007 is comparable to Kaminski's reasonable evidence that the Post Office's parking lot drainage conditions had not existed in the same manner for the past 10 years. The Deters' argument is problematic for a couple of reasons. For starters, as

16

explained in the next section, their evidence that Nemaha-Marshall altered the wires in the GTS in 2007 is unpersuasive.

More importantly, the Deters' argument ignores that the rule for determining when the statute of repose begins to run is when the defendant completes the last original wrongful act. Even under the premises liability cases, this is the rule. See *Bonnette*, 55 Kan. App. 2d 130, Syl. ¶ 4 (holding that "[t]he 10-year period of the statute of repose found in K.S.A. 50-513[b] begins to run when the defendant completes the last act giving rise to the cause of action"). Here, both parties agree that Nemaha-Marshall first negligently wired the GTS no later than January 2000.

In summary, the uncontroverted facts here establish that Nemaha-Marshall connected the GTS to the new house sometime between 1996 and 2000. The heat pumps and appliances all received electricity from the new house. Nemaha-Marshall charged the Deters for work related to the GTS on November 7, 1997. Nemaha-Marshall never charged the Deters for work related to the GTS following 1997. In their petition, the Deters allege that Nemaha-Marshall negligently wired the GTS when it first installed the GTS at their new house. During his deposition, Stephen testified that they experienced low voltage problems before Nemaha-Marshall's February 2007 service call. In other words, the Deters experienced low voltage problems before the date that Nemaha-Marshall employees allegedly regained access to the GTS. Moreover, during his deposition, Stephen also testified that he could not think of any time Nemaha-Marshall worked on the GTS after Nemaha-Marshall installed the GTS.

Consequently, the uncontroverted facts establish that the original act giving rise to the Deters' cause of action—Nemaha-Marshall's negligent wiring of the Deters' GTS— occurred no later than January 2000. This means that the Deters filed their March 2015 petition against Nemaha-Marshall about five years after the statute of repose had expired.

17

*2007 Contacts*

In addition, we note that the Deters' contention that Nemaha-Marshall worked on the GTS in 2007 is unsupported by the record on appeal.

The Deters' argument hinges on their belief that premises liability caselaw applied to their case. Under this belief, the Deters argued (1) that they had evidence that Nemaha-Marshall serviced the GTS in 2007 and (2) that the last act giving rise to the cause of action in their case was in 2007. To review, after Nemaha-Marshall moved for summary judgment, the Deters produced the February 2007 utility meter readout, September 2007 antenna wire invoice, and Stephen's sworn affidavit. Now, in their appellate brief, the Deters allege that the preceding documents, along with Neagele's opinion about cleaning the wires, show that Nemaha-Marshall worked on the GTS in 2007. Yet, this inference is based on supposition and conjecture.

To begin with, the Deters' utility meter readout is simply a printout of the Deters' utility meter readings from May 2005 to July 2007. According to a Nemaha-Marshall lineman supervisor, the Deters' utility meter and GTS are two distinct devices. Nemaha-Marshall could service one without servicing the other. Additionally, the Deters' expert, Neagele, explained that "[a]ny upstream voltage monitoring device, such as the utility electric meter, might not detect [a low voltage] issue."

The antenna wire invoice merely stated that Nemaha-Marshall charged the Deters for a quarter-hour's work and an antenna wire on September 27, 2007. Nothing on the invoice related to work on the GTS. Furthermore, in his sworn affidavit, Stephen admitted that the antenna wire was for his cable, not for his GTS.

As for his sworn affidavit, Stephen stated: (1) that he watched Nemaha-Marshall employees work on the GTS for "about 10 minutes" from his window in February 2007;

18

(2) that Nemaha-Marshall employees checked the connections in September 2007, which he understood to mean they worked on the GTS. At his deposition, Stephen testified that he had Nemaha-Marshall electrical employees out at some point in the mid-2000s to address blinking lights. Nevertheless, he also testified that he had no memory of "a service call out to [his] house" where Nemaha-Marshall electrical workers would have worked on the GTS.

"It is well-established that '[a] party opposing summary judgment may not rest merely on allegations, but must set forth specific facts to support its position.' [Citation omitted.]" *Seitz v. Lawrence Bank*, 36 Kan. App. 2d 283, 289, 138 P.3d 388 (2006). "'The law is clear that "an inference cannot be based upon evidence which is too uncertain or speculative or which raises merely a conjecture or possibility." [Citation omitted.]'" 36 Kan. App. 2d at 290. Moreover, "an affidavit cannot be used to controvert earlier deposition testimony for the purpose of avoiding summary judgment." *Smith v. Kansas Orthopaedic Center*, 49 Kan. App. 2d 812, 818, 316 P.3d 790 (2013). The Tenth Circuit of the United States Court of Appeals has explained that when challenging a summary judgment motion, "the nonmovant's affidavits must be based upon personal knowledge and set forth facts that would be admissible in evidence; conclusory and self-serving affidavits are not sufficient." *Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991). Our Supreme Court has explained that the nonmovant's allegations cannot be "[f]limsy or transparent." *In re Estate of Mullin*, 201 Kan. 756, 761, 443 P.2d 331 (1968).

We determine that Stephen's affidavit testimony about witnessing Nemaha-Marshall employees working on the GTS, or communicating with Nemaha-Marshall employees about working on the GTS in 2007 was insufficient to establish a genuine issue of material fact. Furthermore, because the statements are flimsy and transparent, they "are insufficient to sustain a justiciable controversy requiring the submission thereof to the trier of facts." 201 Kan. at 761.

19

Finally, the Deters' assertion that Neagele's opinion that at some point somebody removed, cleaned, and then rewired the GTS does not establish that Nemaha-Marshall did this. The GTS was on the Deters' property for about 15 years. Moreover, as mentioned earlier, although Nemaha-Marshall installed the GTS, the GTS belonged to the Deters. To find that the 2007 utility meter readout and antenna wire invoice relate to the GTS box through Neagele's contention that somebody messed with the GTS wires at some point, this court would have to speculate. As a result, although Nemaha-Marshall may have interacted with the Deters in 2007 when it provided them the utility meter readout and antenna wire services, those services do not establish that Nemaha-Marshall either (1) serviced the GTS or (2) disturbed the GTS without permission. Thus, we conclude that the Deters have failed to come forward with evidence showing a genuine issue of material fact.

*Improper Arguments*

Finally, the Deters raise two arguments why the district court erred in granting Nemaha-Marshall's summary judgment motion that are not properly before this court.

First, the Deters seemingly complain that Nemaha-Marshall cannot seek tariff protections. Below, the Deters raised the tariff issue in their pretrial questionnaire. Although the Deters do not acknowledge this in their brief, the district court did not reach the tariff issue because it granted Nemaha-Marshall's summary judgment motion based on the statute of repose. It is a well-known rule that this court does not decide moot issues. *Stano v. Pryor*, 52 Kan. App. 2d 679, 682-83, 372 P.3d 427 (2016). Here, whether Nemaha-Marshall was entitled to tariff protections is moot because Nemaha-Marshall is entitled to summary judgment under the statute of repose.

Second, the Deters argue that the doctrine of equitable estoppel requires this court to reverse the district court's summary judgment ruling. Below, the Deters included one

sentence on estoppel in their motion to alter or amend the district court's summary judgment ruling: "There is reason at this point that Defendant, Nemaha Marshall, by Defendant's own actions should be estopped to claim the statute of repose." When the district court denied this motion, it did not address the Deters' reference to equitable estoppel. Perhaps, the Deters' failure to object to the district court's order precludes this court's review. See *McIntyre v. State*, 305 Kan. 616, 618, 385 P.3d 930 (2016) (holding that parties must object to inadequate findings of fact and conclusions of law to preserve their arguments for appeal).

Regardless, the Deters' appellate argument consists of one paragraph in which they assert that this court should equitably estop Nemaha-Marshall from pleading the statute of repose because Nemaha-Marshall conceded that it negligently wired the GTS. They cite no caselaw to support their contention that courts should equitably estop parties who concede negligence from using the statute of repose as an affirmative defense. This court has consistently held that an appellant abandons a point raised incidentally in a brief. *Russell v. May*, 306 Kan. 1058, 1089, 400 P.3d 647 (2017). Moreover, this court has held that the failure to support a point with authority, or explain why that point is sound despite a lack of supporting authority constitutes abandoning the issue. *University of Kan. Hosp. Auth. v. Board of Comm'rs of Unified Gov't*, 301 Kan. 993, 1001, 348 P.3d 602 (2015). Here, we determine that the Deters have abandoned their argument by including no analysis in their brief.

*Did the District Court Err by Granting Alliance's Motion for Summary Judgment?*

Next, the Deters argue that the district court erred when it granted Alliance's motion for summary judgment. In their brief, the Deters allege that they have two claims against Alliance. First, they allege that their homeowner's insurance policy covers the low voltage damage, meaning Alliance wrongly denied both their claims for damages on the original heat pump and the replacement heat pumps. Second, they contend that Alliance

had a legal duty to inspect their property and discover that the source of their electrical problems was the wiring within the GTS. The Deters argue that Alliance did not investigate their claims in good faith.

Alliance responds that its homeowner's insurance policy with the Deters, as well as the equipment breakdown policy, did not cover low voltage events. Moreover, Alliance argues that it adequately investigated the Deters' claims.

*Homeowner's Insurance Policy*

To begin our analysis, we note that the Deters have abandoned any argument that their homeowner's insurance policy with Alliance covered their heat pumps damaged by low voltage. In their brief, the Deters have included no analysis on their homeowner's insurance policy. Instead, they include a single sentence in which they assert that their homeowner's insurance policy provided coverage. The remainder of their brief focuses on the bad-faith investigation argument. Furthermore, the Deters did not address whether their heat pumps and appliances were fixtures annexed to their realty or merely personal property. This analysis was important because the Deters' homeowner's insurance policy contained different provisions depending on whether the insureds were claiming that the event damaged their dwelling or their personal property. The Deters also never address that when they filed their claims with Alliance, they only requested damages for their original heat pump and for the replacement heat pumps. Now, they seemingly assert that they are entitled to damages from Alliance for their appliances as well.

Again, this court considers points raised incidentally in a brief abandoned. *Russell*, 306 Kan. at 1089. Here, by providing no analysis about how their homeowner's insurance policy covered low voltage events, we determine that the Deters have abandoned this argument.

22

Regardless, assuming for the sake of argument that the heat pumps and appliances were fixtures attached to the Deters' realty, we note that the district court correctly determined that the Deters' homeowner's insurance policy with Alliance covered no damage caused by low voltage events. Section 1—Exclusions (B) of the Deters' homeowner's insurance policy provides:

"We do not insure for loss to property described in Coverages A [Dwelling] caused by any of the following . . . :

. . . .

3. Faulty, inadequate or defective:

. . . .

b. Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

c. Materials used in repair, construction, renovation or remodeling; or

d. Maintenance;

of part or all of any property whether on or off the 'residence premises.'"

Here, the Deters' entire case hinges on Nemaha-Marshall's defective workmanship when wiring the GTS. As a result, the district court properly found that the homeowner's insurance policy covered no property loss stemming from Nemaha-Marshall's defective workmanship under this provision of the Deters' homeowner's insurance policy.

Assuming arguendo that the heat pumps and appliances constituted personal property, we point out the provision of the Deters' homeowner's insurance policy entitled Section 1—Perils Insured Against (B): Coverage—Personal Property lists what direct physical losses it covers. Losses to electrical wiring caused by a low voltage event are not included in the perils that are covered. Indeed, this provision specifically excluded coverage to the circuitry of appliances and fixtures damaged by "sudden and accidental damage from artificially generated electrical current." Thus, under the Deters' homeowner's insurance policy, no coverage existed for electrical events (1) that the utility

23

caused, i.e., that is artificially generated electricity, and (2) that damaged only fixtures and appliances. For this reason, the Deters' homeowner's insurance policy does not cover losses caused by the low voltage events artificially generated by Nemaha-Marshall's negligent wiring if the Deters' heat pumps and appliances constituted personal property.

Last, throughout this case, the Deters have used the term "low voltage events" and "brown outs" interchangeably. For instance, in his affidavit, Stephen asserted that in "January and February 2007 [they] experienced 'low voltage events,' more [commonly] known as 'brown outs' . . . ." The Deters' equipment breakdown policy specifically excludes coverage for "loss, damage, or expense caused by or resulting from: [ ] electrical power surge or brown out." Because the Deters admittedly experienced brown outs because of Nemaha-Marshall's wiring of the GTS, they were not entitled to coverage under their equipment breakdown policy.

As a result, even if we were to assume that the Deters had not abandoned their argument on appeal, it is readily apparent that the Deters' homeowner's insurance policy did not cover the damage caused by the low voltage events.

*Bad-Faith Investigation*

The Deters frame this issue as follows: "If the insurance company is informed of the problem from the start and decides to investigate, does the insurance company have an obligation to look into the customer's complaint?" Essentially, the Deters assert that because they originally told Alliance that they believed low voltage had caused the damage to their heat pumps, Alliance had a duty to investigate if low voltage caused the damage to their heat pumps.

The Deters concede that for their claim on the original heat pump, they switched theories on what caused the damage mid-claim; at first, they asserted it was low voltage

24

*from wires on the heat pump*, then they asserted that lightning caused the damage to the heat pump. But the Deters believe that their assertion that lightning caused the damage to the original heat pump should not matter since they had mentioned low voltage before. The mere mentioning of low voltage created Alliance's duty to investigate low voltage. The Deters go on to attack the findings of Alliance's claim investigators—Bitar and Geer. Nevertheless, the Deters' argument is unpersuasive.

The Deters are correct that insurers must make a good-faith investigation of a claim under Kansas law:

> "[A]n insurance company is not required to pay a claim when there is a good-faith legal or factual reason to deny a claim, but at the same time, the insurer has a duty to make a good-faith investigation of the facts before refusing to pay. [Citations omitted.] '"Good faith on the part of the insurer implies honesty, fair dealing and adequate information." [Citation omitted.]'" *Foster v. Stonebridge Life Ins. Co.*, 50 Kan. App. 2d 1, 28-29, 327 P.3d 1014 (2012).

While it is true that Neagele concluded that low voltage may have caused the damage to the original heat pump, Neagele made this opinion (1) after being told there was a low voltage problem and (2) after being shown photographs of the wiring within the GTS. When considering whether an insurer acted in good faith while investigating a claim, we note that the insurer has a duty to make an investigation of the facts and circumstances before refusing to pay the claim. Here, when Bitar conducted his examination of the original heat pump compressor, the Deters were still alleging that lightning damaged the heat pump. Because the Deters were alleging lightning damage, it is unclear how Bitar had a duty to investigate low voltage. Moreover, Neagele—the Deters' own expert—determined that Bitar's conclusion that the original heat pump suffered a prolonged electrical failure because of low refrigerant was reasonable.

Because Neagele believed that it was a reasonable conclusion that the original heat pump failed because of low refrigerant, we cannot conclude that Alliance conducted a bad-faith investigation into the original heat pump claim. Clearly, a reasonable factual basis existed for Alliance to deny the Deters' original claim.

Next, when Geer examined replacement heat pump #2, he observed that replacement heat pump #2 had no damage. An insurance company cannot be expected to find evidence of damage that does not exist. In any event, Geer's report explicitly stated that there were "no indications of low voltage." In other words, despite the Deters' contention to the contrary, Geer investigated the Deters' assertion that replacement heat pump #2 was not functioning because of low voltage. Furthermore, replacement heat pump #2 continues to work without problems. This means that Geer's analysis continues to be sound—that replacement heat pump #2 did not experience low voltage damage.

Although Alliance ultimately denied the Deters' claim for damages related to replacement heat pumps #1 and #2, as considered earlier, Alliance properly denied the Deters' claim because their homeowner's insurance policy and equipment breakdown policy did not cover damage from low voltage events. Again, to investigate with good faith, the insurer needs to act with honesty, fair dealing, and information. *Foster*, 50 Kan. App. 2d at 28-29. When Alliance denied the Deters' claim on the original heat pump, it acted on the information available then. When Alliance denied the Deters' claim on the replacements heat pumps, it acted on the information available then, which included the knowledge of Nemaha-Marshall's negligent wiring.

The Deters' argument ignores that Alliance's duty to investigate exists only for the purpose of resolving the claim. Here, Alliance had legitimate factual reasons based in the Deters' homeowner's insurance policy for resolving the Deters' claims. As a result, when Alliance denied the Deters' claim, we conclude that Alliance did so in good faith.

26

Although the district court did not use this reasoning when rejecting the Deters' argument, this court can uphold the district court's decision when it reaches the correct result regardless of the reasoning the district court uses. See *Gannon v. State*, 302 Kan. 739, 744, 357 P.3d 873 (2015). For the preceding reasons, we affirm the district court's order of summary judgment in favor of Alliance.

Affirmed.